This case is 22-1732, Tehrani v. Hamilton Technologies. Counselor Kendrick, you've asked for seven minutes for rebuttal, is that correct? We're ready when you are, sir. Good morning, Your Honors. May it please the Court. My name is Mark Robert Kendrick, and I am representing Dr. Fleur Tehrani in this case 22-1732. At issue in this appeal are Claims 1-6, 9-12, 29-33, and 41 of U.S. Patents 7-802-571. Claims 1 and 29 are independent claims, and the other claims at issue are dependent claims. The patent covers the first fully automatic oxygenization and ventilation system. The oxygenization parameters, fraction of inspired oxygen, FiO2, and the end expiratory pressure, PEEP, are determined automatically every fraction of a second. For example, every 0.75 seconds as shown in Figure 3i of the patent, Step 318 in Appendix 85. Mr. Kendrick, I think we're familiar with the technology from the briefing and the record. You raised 10 or 12 issues by my count, a lot of issues. What do you think is your strongest issue? The strongest issue is that the prior art documents that were cited against us, the court earned in determining that they presented true information, as well as that they could be combined with the other reference, the second reference. On the true information, I saw there was an attack on the accuracy of certain of the prior art references. Is that what you're referring to? Yes. Isn't that inherently a fact question and wasn't there substantial evidence for the board to find that the references actually were reporting true information? No, we don't believe there was substantial evidence for the board to find that because if you look at the testimonies of Dr. Tehrani versus their testimonies, we don't believe there was substantial evidence. That just sounds inherently like something that is for the board to make fact findings on and they believed something different than you wanted them to believe. Isn't that what the board is there for? The board is there for that, but we don't believe that they considered our arguments thoroughly enough and didn't understand potentially the technology at issue as much as they should have. This is perhaps a good point for me to make the final comment, which I wanted to address before we started the argument. In your brief, you used terms like baseless schemes that are made up by the board, a double standard and fallacy implemented by the board to keep the petition exhibits, et cetera. This tone that you have runs throughout your brief and I just want you to know, I find it to be disrespectful, discourteous, and not beneficial. It doesn't help the case at all to attack with labels the other side, especially the board and the decision. Now the decision may be wrong, it may be without a basis or something of that nature, but the personal attacks is something that there's just simply no room for, not only in this profession. Understood. Understood that you're on the line. I take that on the line. Do you want to talk about specifics, for example, you said that you think one of your strongest issues is that you don't think that the board, you think the board, it wasn't substantial evidence to support the board's finding that the prior art taught what it purported to teach. Do you want to say specifically why? Are you prepared to identify specific testimony today? Because that's, you know, if you're talking about lack of substantial evidence, you need to have specific sites and direct us to specific arguments, specific evidence. Yeah, I think. I mean, it's not going to be enough just to cite to the evidence that supports you. You need to explain why the evidence that's contrary to your position should be disregarded. Understood, and I will attempt to do that as much as possible. What, when we look at the evidence that we feel was not considered by the board, first we can start with Carmichael. And Carmichael is a survey that is prepared, it was a number of physicians, they took it, they mailed in the survey and they talked about different PEEP and FIO2 that they could use for automated ventilators, and most of those physicians, I'm sorry, most of those physicians or doctors utilized, excuse me, what is it called? No, we're familiar with the prior art, so we have it all in front of us, so if you want to get into specifically what Carmichael lacks. Okay, so what Carmichael lacks is Carmichael doesn't talk about that you can determine a FIO2 or F or P for an X breath. It doesn't talk about that in any way, shape, or form. It's talking about an assist control ventilator, assist control ventilator, and those, what you do is you set the PEEP and you set the FIO2 initially, and then you let it run, and then basically you'll go in back and based upon the results later, from 15 minutes to two hours in time, you will then change those settings to see if you can improve the oximization parameters for the ventilator. So it's a manual setting of those two parameters? Yes, yes, that's what assist control. It also, when you look at Carmichael, the one thing it talks about is it doesn't talk about keeping a ratio of PEEP to FIO2 within a specific range. The argument that is made, and if you look at figure seven of Carmichael, the argument is made that, oh, if you look at the highest PEEP versus the FIO2, that is where you can determine what the ratio is. But if you look at that, you basically are looking at a, figure seven is a chart that shows, and I want to make sure I say it correctly, it shows multiple values that can be utilized for each of the values of FIO2, multiple PEEP values. And it even talks about the fact that the typical best PEEP, which I believe is what the appellee mentioned before, was, for example, for 0.5 was 11 plus or minus 5 centimeters of H2O for PEEP. So it's not really talking about a specific, specified range. It's talking about a number of range. For example, for 0.5, you could have multiple ratios, 11 over 0.5, 9 over 0.5, 7 over 0.5, or 6 over 0.5. So that's why we don't believe that Carmichael teaches that part of the invention. In addition, we don't believe, and this is overall with all of our arguments, we don't believe that you can take protocols, like it's what, that's what they're referring to here, where they're talking about different pairs of the PEEP and FIO2, that you can do that and you can put that into an automated system, an automated ventilator, because they just don't operate that way. And specifically, that would bring me over to Anderson. Anderson is, and really the key, there's figure two in Anderson, and then there's also figure seven in Anderson. Figure two talks about the actual system construction of Anderson, and I need, I want you to... We believe figure two of Anderson is wrong because of the fact that you can't have a system utilizing a lookup table as part of the system, because PID control is a negative feedback system, and a negative feedback system requires complete control, meaning complete, excuse me, negative control. And what you're not doing there, you can't for every breath of the patient go up to the lookup table, and the lookup table is shown in like figure three, and determine whether or not to turn on or off PEEP or FIO2, okay? And also you can't... Can I ask you about Dr. Imbrus, that was their expert that you challenged, correct? Yes, yes. You argue, I think, that he was not a person of skill in the art, but you did not provide a definition of a person of skill in the art, you agreed to their definition, is that right? We agreed to their definition, but their definition was, I'm sorry. And so which part of their definition does Dr. Imbrus not meet? Any of them, because he's not, I believe there was an engineer, two different, an engineer of skill in the art, or an engineer with a master's degree, or a clinician. We don't believe... You don't think he's a clinician? No. But he was a clinician some time ago, but he was a clinician, correct? He was a clinician 40 years ago, but things have changed in the last 40 years. Does the definition of a person of skill in the art say they have to be a clinician more recently than 40 years ago? Well, I think they have to understand the... We don't believe he had the knowledge regarding automated ventilators that he needed. But what makes him not within the definition of a person of skill in the art? Is it the lack of an engineering degree, or is it that he's not a clinician, or both? Well, it's lack of an engineering degree, but also we don't believe he's a clinician because he hasn't been a clinician in 40 years. He didn't renew his respiratory therapist certificate, and he doesn't really have the experience on these ventilators that he'd need to have in order to make his declaration. Did the board find that he was a person of ordinary skill in the art? The board did find that, I believe so, yes. He was a clinician. Sorry. In your view, is that a factual finding? In your view? I'm not the most experienced in front of this court, I'll tell you that. It's a factual... I believe they made a factual determination, but I believe it was an error that they made that. If I couldn't hear you, they made a factual finding, then could you repeat that? Oh, and I've said it was just an error, that the factual determination they made was an error, that it was incorrect. In addition, and again, should I keep going? I've gone over... Have I gone over my time? Yeah, you still have a little bit of rebuttal time. You're into your rebuttal time. Do you want to finish now, or... I'll talk a little bit about Anderson, and then I'll finish. Okay. Figure 7 of Anderson is also really dispositive. Figure 7 shows that PEEP was not changed for 12 hours. It also shows that FIO2, if you look at FIO2, it starts out at 45, goes to 80, comes back down to... I say 45, but it's between 45 and 50. That shows, again, that the ratio wasn't maintained. There was no ratio maintained, because PEEP was going up and down... I'm sorry. FIO2 was going up and down like that, and PEEP was staying the same. Also, if you look at PEEP, if there was PID control of PEEP, like that has been alleged in Anderson, then it would never stay the same for that long. It wouldn't stay the same four minutes at a time, right? Because that's just the way it is. But it would not stay for 12 hours, which is what it said. And even when it is changed, it's changed in a way where it's stepped up. And that clearly, to us, shows that it's a manual adjustment, because it's not something that was ramped up. It was something that was stepped up. Okay. Thank you. Now, Counselor Keehan. May it please the Court, Patrick Keene and Co-Counsel Matthew Fedowitz on behalf of the appellee, Hamilton. I have three quick points I'd like to make, and then I will offer some comments in response to those of my friend on behalf of the appellant. The three points I'd like to begin with are that there is substantial evidence for all of the Board's factual findings, detailed throughout the final written decision, which is at 1-69 of the appendix. There was no error of law. To the extent an error of law is implicated, it's based on factual underpinnings, which are supported by substantial evidence. And finally, the Board acted fully appropriately in the implementation and management of all of its rules. With those three points, the final written decision should be affirmed. And now I'd like to offer a few comments on some of the points that my friend addressed there. They are all factual issues, as Your Honors seem to appreciate. The Carmichael reference, which was referred to, was the base reference used in a ground that was initially an anticipation ground that involved what were, in fact, automated ventilators. The ventilators have a computer in them. Can you explain why Figure 7 shows ratios? I think I understand why it is, but could you explain it? Yes, certainly, Your Honor. Figure 7 is showing the limits on the oxygen, the FiO2, and the pressure, the positive end expiratory pressure. And the ratios are the slope, basically, of that curve. And what the patent claim is directed to is managing an automated ventilator so that for patient safety you don't exceed certain limits of PEEP and FiO2. That's what the PEEP ratio is. Is the idea that when you look at Figure 7 and you see there's a certain PEEP for a certain FiO2, like ranges, if you will, that that's what the ratios are? That that inherently shows, you know, for a certain PEEP you'd have a certain FiO2, which itself is a ratio? Is that how you understand that, or am I simplifying it? I'm sorry. I'm just talking about the prior art, not the claim, but Carmichael, what Carmichael teaches. Well, what Carmichael shows is a boundary, a limit, on what the PEEP can be, as you're indicating, and a boundary on what the FiO2 can be. So for patient safety, neither of those ranges can be exceeded. So for a certain FiO2, PEEP can only be so high. For another FiO2, PEEP can only be so high. So PEEP is restricted to something like 0.6 millimeters of hemoglobin, I think was the number. I don't have it right in front of me. But PEEP is limited, and PEEP is the pressure. You can't allow that pressure to exceed certain limits where you could damage a patient's lungs. So what the chart is showing is that we're going to allow therapy to continue until PEEP is at a certain limit, and if we're not achieving a desired level of therapy, we're going to adjust the amount of oxygen and then incrementally move the pressure to push that oxygen into the patient. But nevertheless, we're going to observe limits, and the limits are relative to PEEP, and the FiO2 limits are demonstrated by the slope of that curve. Thank you. The appellant says there's no reference to automatic in Carmichael. Is that true, and is that a problem for your obvious miscontention? It's not a problem. What is mentioned, I think what my friend's definition of automatic is, is something like a fully automatic. And what Carmichael was using were automated ventilators that had computers in them to perform this assist control, whereas I think Your Honors noted you could set an adjustment, you could set an FiO2 or a PEEP, and then the automated ventilator would, with a computer, perform to that set level. So there was automation, and there was automation. Carmichael was being used at the time to develop what would be appropriate limits for PEEP and FiO2. And so it was using existing ventilators, and some of those existing ventilators were in the prior arc that we relied upon, such as in our earlier grounds, the Weissel patent was an existing fully automated ventilator that most likely was used by Carmichael, by the clinicians in Carmichael, to run those tests. But it just didn't say it, and the board said, we want to see the actual structural characteristics of a ventilator in a reference. And that's where we brought in our grounds three and four, that with substantial evidence the board said, yes, we see the application of an automated ventilator using these clinically derived limits for PEEP and FiO2 and simply programming the automated ground three or ground four to provide patient therapy around the limits of PEEP and FiO2 that are announced in Carmichael. My friend did mention, Anderson presented untrue data in that you couldn't use a lookup table with PID control, PID being proportional integral derivative control.  And the board found substantial evidence to support its finding that, in fact, PID could be used with a lookup table in exactly similar fashion as to what the patent disclosed using loop indicators to set different types of therapy. So it's not a question of going back and forth to a lookup table every breath. At every breath the computer can look at what the parameters are, the settings for the PEEP and the FiO2, and it can see if they're within the limits of what the lookup table says they should be. But the actual continuous control is through the PID controller to the ventilator. So the board found that lookup tables could be used with PID control. The third point I would address is, and Judge Stark mentioned, the qualifications of Dr. Imbrus as a POSITA, and the board did find that, that Dr. Imbrus had been a practicing clinician at the time, at the relevant time that this patent was developed. Do you think that the board, we have some case law like Keosera, for example, or Sundance that says that for somebody to testify on an issue that is viewed from the perspective of a person of ordinary skill in the art, like say obviousness, that they have to actually be a person of ordinary skill in the art. Do you think the board followed that case law? I mean, absolutely. I would say that the board vetted Dr. Imbrus' credentials as a clinician who had experience in developing, designing, producing. I believe he was involved in the development of a major ventilator for a well-known international company. So he had experience in the design of ventilators and in the application of therapy to those, such as PEEP and FiO2 limits. So certainly his clinical experience in the relevant time period, when he was familiar with the ventilators, the automated ventilators that existed at the time, such as Andersons and Tao, qualified him as a basita. Does that? It does. There are some, the board never says he is a person of ordinary skill in the art. So should I be concerned about that? You can look at where it never uses that exact phraseology. The question would be whether they, in fact, said he was a person of ordinary skill in the art by going through the definition of a person of ordinary skill in the art. I believe that, and we can check the final written decision, but I was confident that the board did say we consider him to be a person of ordinary skill in the art. And I would add also that because of the accusations that were made on the Anderson paper, we went out and questioned Dr. Anderson and actually brought him in as a witness to substantiate things that Dr. Embruce was saying about the application of therapy, treatment FiO2 and PEEP ratios to automated ventilators. And Dr. Anderson supported Dr. Embruce and Dr. Embruce supported Dr. Anderson. So we had countervailing declarations to support that what Dr. Embruce was saying was in fact true and accurate. Was the issue of a person of skill in the art, was that actually a dispute below? I think what was a dispute was whether it was the accuracy of statements made by Dr. Embruce to which one way we addressed that was to have Dr. Anderson testify and the support of those two declarations in tandem I think the board found compelling. But there was no reason really to question Dr. Embruce's qualifications because he squarely met the first prong of the posit as was defined and agreed upon by the parties, which was someone who had at least five years of experience in clinical therapy with ventilators. And he not only had that, he had something like 10 years and he had been involved in the design and he had patents. So he was familiar with the patent process and so forth. So he was more than qualified, I would say. But whether he was a person of skill in the art, I think was put in dispute. And like Judge Stoll, I'm not seeing where the board made an express finding that he was one of skill in the art, notwithstanding both counsel telling us that there was such a finding. I haven't found it yet. If that's how we see the record, is that a harmless error or what do we do? That is, if we say there was a dispute over whether Dr. Embruce was a person of skill in the art and the board didn't make an express finding on it, what do we do? Well, I think that the board found on its own that the references taught the invention as claimed. And I think that they felt very compelling evidence was what the board found very compelling was Dr. Anderson's testimony about his ventilator. And I would add that Dr. Anderson's testimony did go to the application of the limits that were described in the Carmichael reference to the ventilator that Anderson was actually running in a full, fully automated continuous ventilator therapy mode. For example, the lookup tables that were in, I'm sorry, I think it was the lookup. There was a figure in Anderson and I don't have it right in front of me, but where he does show that you could choose different treatment therapies and he talked about boundaries that aligned with those of Carmichael. So I would say to that extent it is harmless, but I do also think that the board repeatedly recognized the weight that it would attribute to Dr. Embrist's unwritten decision at Appendix 13 where they talked about the weight to give Dr. Embrist's testimony and concluded that we do not agree with Pat and owner that Dr. Embrist's testimony should be disregarded. And so if not nearly expressed, that's a very implicit statement that we consider his testimony, the veracity of his testimony to be high and reliable in terms of comments he made and that the challenge plans were not patentable. So the last point I would like to address is the response again to Dr. Anderson's figure seven. And there was a comment in there about how it must be manual. But again, the board evaluated Dr. Anderson's disclosures in light of Dr. Anderson's testimony and found it to be accurate and reliable, and therefore the interpretations that the board relied upon in its findings and the substantial evidence that it attributed in the form of Dr. Anderson's declaration were compelling for its conclusion that both grounds, well, grounds three involving Dr. Dr. Anderson's paper rendered the claims unpatentable. And with that, I have nothing more to say. If you have any questions, other questions. Thank you. Thank you, Your Honor. Mr. Kendrick, I'm going to restore you to three minutes of time since you covered. I do caution you to limit your comments to the points raised by the other side. Absolutely. In regards to the accuracy of Dr. Ambrose's testimony and the weight that was poured to it, I mean, one of the things that we also looked at was what he didn't disclose certain things in his CV that, you know, I've seen before in his CV, like whether or not he had been an expert before, which he had. And then during deposition, he talked about that he worked on Siemens ventilators, automated ventilators, and that wasn't in his CV also. So that was one of the other things why we believe that Dr. Kay Ronnie is, that her testimony should be giving more weight than what Dr. Ambrose had. It's not for us at an appellate court to decide how much weight to give to different witnesses' testimony, right? That's really something for the trial court, the lower court to decide. Why would we be deciding that? I just think they made an error when they made that determination. They didn't look at all the facts. With regard to Dr. Anderson, yes, he is a doctor. With regards to engineering, he's not necessarily a clinician who worked on the Anderson case. We believe that also there are certain things that, you know, one of the things is when you have a device that's being utilized on patients and it's automatic, you do have to get FDA approval. And he, while he said he thought they had FDA approval, there was no affirmative or definitive statement that it was on, excuse me, that there was FDA approval with regards to that. We also just don't believe he has the background in terms of automated ventilators that he would need to have in order to provide such a statement. One of the things that you see in the uncontested definition of what a person born with an early skill in the art is, there's a sentence at the end that says, a higher level of education or specific skill might compensate for less experience and vice versa. How does that play into it? Doesn't that give a little bit of wiggle room, at least with respect to whether he was a clinician with at least five years of practical clinical ventilator experience, for example? Is this for Dr. Anderson or Dr. Ambrose? For the expert on which you are challenging whether he was a person born with an early skill. For Dr. Ambrose, yeah. I just don't believe his education applies over to the technology that we're looking at, the automated ventilators for the next breath of a patient. So that's why it's my opinion that his testimony should be heard. The last thing I did want to make, there was not a discussion of any ventilators in Carmichael. So to make a statement like that these other ventilators that existed at the time that they were utilized in Carmichael, that's just we don't believe an accurate statement. And really overall, the prior art doesn't show that PEEP and FIO2 are controlled for the next breath, automatically controlled for the next breath. So based upon that, we would ask the court to reverse the board's decision. We respectfully request the court to reverse the board's decision. Thank you. Thank you. We thank the parties for their arguments. This case will be taken under advisement.